### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **OMAR AGUILAR, M20779,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **WEXFORD HEALTH SOURCES, INC.,** ) | |
| **MOHAMMED SIDDIQUI,** ) | **Case No. 19-cv-510-DWD** |
| **GAIL WALLS,** ) | |
| **ANGELA CRAIN,** ) | |
| **JACQUELINE LASHBROOK,** ) | |
| **STEPHEN RITZ,** ) | |
| **JOHN BALDWIN,** ) | |
| **MARY JO ZIMMER,** ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM AND ORDER</u>

**DUGAN, District Judge:**

Plaintiff Omar Aguilar, an inmate of the Illinois Department of Corrections (IDOC) currently incarcerated at Menard Correctional Center (Menard), brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while at Menard.  Plaintiff's lawsuit concerns repeat urinary tract (UTI) and kidney infections and prostatitis from February of 2018 to May of 2019, as well as issues with his hands and feet.  There are two groups of defendants—administrators from the IDOC (Gail Walls, Angela Crain, Jacqueline Lashbrook, and John Baldwin) and medical providers from Wexford Health Sources, Inc. (Mohammed Siddiqui, Stephen Ritz, and Mary Jo Zimmer).  Both groups of defendants have moved for summary judgment, (Docs. 91, 98), and Plaintiff has responded (Doc. 104).  The matter is now ripe for review.  Summary

judgment will be granted in full in favor of all IDOC defendants, and in favor of Dr. Ritz and Wexford.  Summary judgment will be denied in part solely as to Dr. Siddiqui and Zimmer.

## PROCEDURAL HISTORY

Plaintiff initiated this case by filing a complaint on May 15, 2019.  (Doc. 1).  Upon initial review, the Court identified four valid claims:

Claim 1:  Dr. Siddiqui, Gail Walls, Angela Crain, Lashbrook, Dr. Ritz, John Baldwin, Frank Lawrence, Dr. Louis Shicker, and NP Zimmer were deliberately indifferent in the treatment of Plaintiff's kidney infection in violation of the Eighth Amendment;

Claim 2:  Wexford Health Sources, Inc. was deliberately indifferent in maintaining policies that led to Plaintiff not receiving timely, appropriate care in violation of the Eighth Amendment;

Claim 3:  Dr. Siddiqui, Gail Walls, Angela Crain, Lashbrook, Dr. Ritz, John Baldwin, Frank Lawrence, Dr. Louis Shicker, NP Zimmer and Wexford's failure to provide him with appropriate care amounted to intentional infliction of emotional distress;

Claim 4:  Baldwin, Lashbrook, Lawrence, and Wexford were deliberately indifferent to overcrowding at Menard which caused delays in Plaintiff's treatment in violation of the Eighth Amendment.

After review, the claims were all allowed to proceed.  (Doc. 13).

The complaint was served upon the defendants.  After a hearing, summary judgment was granted in favor of Defendants Frank Lawrence and Dr. Louis Shicker for Plaintiff's failure to exhaust administrative remedies as to his claims against these two individuals.  (Docs. 77, 79).  The case proceeded to discovery on the merits.

<u>FACTS</u>

**A. Plaintiff's UTI/kidney/prostate problems**

On February 22, 2018, Plaintiff complained of pain in his left side that had started two days prior, and he was seen at the healthcare unit. He rated his pain as a 10 out of 10, with severe pain when he breathed. (Doc. 92-2 at 59). Plaintiff's temperature was 98.4 degrees, there was no bruising or swelling to the area, his abdomen was soft and not tender, and his urine was clear yellow. He was prescribed acetaminophen and ibuprofen, he got an x-ray, and he was instructed to return to the healthcare unit if symptoms worsened. The x-ray was taken an hour later, and it showed gas in his colon. (*Id.* at 60). Plaintiff was given over-the-counter medications and he was educated on ways to relieve the gas.

On February 25, 2018, Plaintiff returned to the healthcare unit with ongoing complaints of pain in his left side. His temperature was recorded at 100.1, and he had trouble walking. (Doc. 99-1 at 51-52). Dr. Siddiqui was contacted, and he ordered that Plaintiff be taken to the hospital. At the hospital, Plaintiff received a CT scan of his abdomen and pelvis. (Doc. 99-2 at 64-65). He was diagnosed with a UTI, and suspected pyelonephritis.[1] Plaintiff was given 1000mg of Tylenol for his fever, and a dose of Ciprofloxacin (Cipro, an antibiotic) for the infection. He was also given a prescription for 10 days of Cipro.

---

[1] Pyelonephritis is a kidney infection associated with UTIs. *See,* Kidney Infection by the Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/kidney-infection/symptoms-causes/syc-20353387, last accessed January 14, 2023.

Upon return to Menard, a nurse charted the outcome of the hospital visit.  (Doc. 99-1 at 54).  Plaintiff reported to the nurse that with the Tylenol he was not in much pain. He rated his pain as mild discomfort, or a 1-2 on a scale of 10.  In consultation with Dr. Siddiqui, Plaintiff was returned to his housing unit.  (*Id.*).  On March 2, 2018, Plaintiff reported to a nurse in the morning that he was still in pain, which was a 10 on a scale of 10.  (Doc. 99-1 at 56).  The same day Plaintiff saw a nurse practitioner, to whom he reported, "trust me I feel better."  (Doc. 99-1 at 58).  He reported he was still very sore but felt much better.  A urinalysis was performed, and Dr. Siddiqui was consulted.  Based on the consultation, Plaintiff was switched from Cipro to ten days of Bactrim, and he was scheduled for a follow-up.  (*Id.*)  On March 7, 2018, a repeat urinalysis was performed, and Plaintiff saw Dr. Siddiqui.  (Doc. 99-1 at 59).  Dr. Siddiqui noted that an ultrasound should be performed, and he recommended it for collegial review.  (*Id.*; Doc. 99-2 at 68).

Plaintiff's file was considered by Drs. Siddiqui and Ritz during a collegial review on March 16, 2018[2].  (Doc. 99-2 at 69).  Dr. Ritz recommended an alternative treatment plan, which contemplated waiting for Plaintiff to complete his antibiotics, seeking the CT results from the hospital, and conducting a detailed assessment.  (*Id.*).  Drs. Ritz and Siddiqui both averred that they believed this was a reasonable treatment plan.  (Ritz Aff., Doc. 99-13 at ¶¶ 13-15; Siddiqui Aff., Doc. 99-14 at ¶ 27).

Plaintiff returned to the healthcare unit on March 26, 2018, with complaints of ongoing pain in his left side.  He rated the pain as a 7 out of 10.  His temperature was

---

[2] The collegial review notes are dated March 16, 2018, but Plaintiff's medical chart and Drs. Ritz and Siddiqui's affidavits mention a collegial review on March 15, 2018.  Compare (Doc. 99-2 at 69 *with* Doc. 99-1 at 61 and 99-13/99-14).  The discrepancy does not impact the substantive analysis in this case.

96.3, and a urine dipstick test noted abnormal findings. (Doc. 99-1 at 62). Plaintiff was given ibuprofen and he was advised to return to nurse sick call as needed. On March 28, he was seen for a follow-up, but it was noted that there was no need to see him and he was directed to follow-up in a week. On April 2, 2018, Plaintiff was seen again by Dr. Siddiqui. (Doc. 99-1 at 63). Dr. Siddiqui ordered another urinalysis and he again referred Plaintiff's case to collegial review. (Siddiqui Aff., Doc. 99-14 at ¶¶29-30). The urinalysis was done on April 4, 2018. (Doc. 99-1 at 64). Plaintiff's case was considered at collegial review on April 11, 2018, and Dr. Ritz approved an ultrasound. (Doc. 99-1 at 64; Doc. 99-3 at 3). The ultrasound was performed on April 13, 2018. (*Id.*). The ultrasound revealed no mass lesions of any kind. (Doc. 99-3 at 2).

On May 8, 2018, and May 13, 2018, Plaintiff returned to the medical unit with complaints of left side pain. On May 13, he rated his pain as 10 out of 10. (Doc. 99-1 at 67). The findings of a urine dipstick test were abnormal. He was given acetaminophen and he was referred to the doctor. On May 16, 2018, Dr. Siddiqui saw Plaintiff and noted that the ultrasound of his kidneys was negative. (Doc. 99-1 at 68). He was prescribed Cipro for five days.

On May 26, 2018, June 1, 2018, and June 2, 2018, Plaintiff again complained of left side pain, which he rated as 8 out of 10. On June 6, 2018, Nurse Practitioner Zimmer saw Plaintiff and ordered a battery of tests. (Doc. 99-2 at 1). The labs were completed and on June 22, 2018, Plaintiff was seen again by Zimmer to follow-up. No new concerns were noted, and the exam was recorded as normal. (Doc. 99-2 at 3).

On June 28, 2018, Plaintiff again reported to the medical unit with pain of an 8 out of 10 on his left side. (Doc. 99-2 at 4). Plaintiff reported that he was concerned because he was still in pain, but all the labs that had been done were normal. He was referred for a doctor visit.

On July 23, 2018, Plaintiff was seen again by Zimmer who prescribed Macrobid for seven days and ordered chest and rib x-rays. (Doc. 99-2 at 5). The x-rays were completed on July 25, 2018.

On August 15, 2018, Zimmer noted that Plaintiff continued to have recurring UTIs and that he reported pain. She prescribed an additional seven days of Macrobid, and she referred him to collegial review for a urology appointment in conjunction with Dr. Siddiqui. (Doc. 99-2 at 7). On August 24, Dr. Ritz approved an external urology evaluation. (Doc. 99-3 at 4). On August 29, Dr. Siddiqui charted that an August 22, urinalysis was negative, and that Plaintiff was currently on Macrobid. (Doc. 99-2 at 10; Siddiqui Aff., Doc. 99-14 at ¶45).

A September 18, 2018, memorandum from Gail Walls indicates the urology appointment was scheduled for October 30, 2018. (Doc. 99-3 at 5).

On October 30, 2018, at the external visit Plaintiff was prescribed doxycycline for 14 days, and he was given an ambulatory referral to urology. (Doc. 99-3 at 8-9). The medical records include a prescription from Dr. Rajamahanty at SIH Medical Group (SIH) in Carbondale, Illinois, for doxycycline twice a day for two weeks. (Doc. 99-3 at 9). The SIH medical records do not include visit notes from Dr. Rajamahanty, other than handwritten notes on Menard's transfer summary document, where Dr. Rajamahanty

noted her recommendation for a CTU, cystoscopy, and TRUS prostate exam.  (Doc. 99-3 at 6).  On October 30, 2018, a nurse noted that Plaintiff had returned from his medical furlough with a prescription and a recommendation for procedures.  (Doc. 99-2 at 13)  No nurse practitioner or doctor was available to see Plaintiff upon his return.  It was noted that Plaintiff would follow-up with a doctor or nurse practitioner within five days.

On November 1, 2018, Zimmer charted for a medical furlough follow-up that Plaintiff went out to urology and no procedures were done.  (Doc. 99-2 at 14).  She charted "scheduled for further tests."

In affidavits, Dr. Siddiqui and Zimmer both report that   Plaintiff was seen by Dr. Rajamahanty who recommended further tests, and he was diagnosed with prostatitis.[3] (Siddiqui Aff., Doc. 99-14 at ¶¶ 48-49; Zimmer Aff., Doc. 99-15 at ¶¶48-49, 51).   On December 5, 2018, Dr. Siddiqui noted that Plaintiff had been seen by a urologist on October 30, 2018, and completed two weeks of Doxycycline.  (Doc. 99-2 at 19).  Plaintiff reported odor in his urine and Dr. Siddiqui ordered repeat urinalysis tests.

On January 10, 2019, Zimmer charted a follow-up for urology and kidney issues.  (Doc. 99-2 at 26).  She noted that recommended tests from urology would be sent to collegial review.  (Doc. 99-2 at 26).  On the same day Dr. Siddiqui or Zimmer[4] signed a Medical Special Services Referral and Report wherein it was noted "seen Dr.

---

[3] According to the Cleveland Clinic, there are four types of prostatitis: acute bacterial prostatitis (an infection caused by a UTI); chronic bacterial prostatitis (bacteria become trapped in the prostate causing recurrent UTIs); chronic pelvic pain syndrome (prostate gland inflammation that causes chronic pain); and asymptomatic inflammatory prostatitis (chronic prostate gland inflammation with no symptoms).  Prostatitis, The Cleveland Clinic (last updated Jan. 7, 2021), https://my.clevelandclinic.org/health/diseases/15319-prostatitis.
[4] The printed practitioner's name on this form is Dr. Siddiqui, but the signature is clearly Zimmer's signature.  (Doc. 99-3 at 10).

Rajamahanty on 10/30/18 who ordered further tests but was never scheduled. I/m continuing to have problems." (Doc. 99-3 at 10). All three tests were approved by Dr. Ritz in collegial review with Dr. Siddiqui on January 25, 2019. (Doc. 99-3 at 15-17). The CT scan was scheduled for February 22, 2019, and the cystoscopy and TRUS procedure were scheduled for April 2, 2019. (Doc. 99-3 at 18-19).

The CT urogram revealed no abnormalities of the kidneys, renal collecting system or bladder. (Doc. 99-3 at 21). The cystoscopy and transrectal ultrasound also showed no tumors, stones, suspicious lesions, or other abnormalities in the bladder or prostate. Dr. Rajamahanty recommended Bactrim for the ongoing prostatitis. (Doc. 99-3 at 31). A prescription was given for Bactrim twice a day for four weeks, to be followed by once a day for three months. (Doc. 99-3 at 35). On April 12, 2019, the follow-up was approved in collegial review. (Doc. 99-3 at 40).

Plaintiff was seen for a follow-up at SIH medical on April 12, 2019, and it was recommended that he continue the treatment for the prostatitis. (Doc. 99-3 at 41). He was approved for further follow-ups via collegial review. (Doc. 99-3 at 44). Plaintiff was taken to a follow-up on May 7, 2019, but the urology office reported that he was not seen on this date because he had just been seen on April 12, 2019, for a follow-up. (Doc. 99-2 at 57). Plaintiff was re-scheduled for a follow-up in August.

On August 26, 2019, Plaintiff was seen at SIH for a urology follow-up. (Doc. 99-7 at 27). The assessment noted that he had "chronic prostatitis," for which he completed a course of Bactrim. (Doc. 99-7 at 28). Plaintiff reported moderate improvement, but he still had foul smelling urine, and an urgent/frequent need to urinate. (*Id.* at 28-29). He

was directed to follow-up in two weeks.  The records demonstrate that Plaintiff had follow-up appointments and further testing from 2019-2021.  (Doc. 99-7 at 31-44, 61-70; Doc. 99-8 at 1-70).

**B.  Plaintiff's burning/red hands and feet**

On November 17, 2018, nursing notes indicate that Plaintiff has been to nurse sick call twice with complaints of redness to his hands and feet and a burning sensation.  (Doc. 99-2 at 16).  On November 28, 2018, Plaintiff saw Dr. Siddiqui for the burning and redness. Dr. Siddiqui noted that he had stopped Buspar and Zoloft, and he was advised to see psych to resume his medications for anxiety.  (Doc. 99-2 at 18).

On January 8, 2019, Plaintiff was seen again by a nurse for complaints of redness and burning on his palms and feet.  (Doc. 99-2 at 25).  The nurse noted he has been seen for this since September of 2018.  On January 10, 2019, Zimmer noted that she saw Plaintiff for a follow-up about his hands and feet, and for a follow-up on his urology issues. Nothing specific was ordered about Plaintiff's hands and feet.  (Doc. 99-2 at 26).  On January 19, 2019, Plaintiff saw a nurse again concerning his hands and feet.  (Doc. 99-2 at 28).

On January 25, 2019, Plaintiff saw Zimmer for ongoing complaints of his burning hands and feet, as well as his kidney problems.  (Doc. 99-2 at 29).  Zimmer noted that his skin appeared normal, and he had good capillary refill, and a good lateral pulse.  He was advised of an upcoming appointment to see urology.  Ultimately, the visit was ended because Plaintiff raised his voice.  (*Id.*).

On February 6, 2019, Plaintiff's psychiatric progress notes indicate that the redness and burning in his hands and feet were discussed at his psychiatric appointment. (Doc. 99-6 at 39-46). Plaintiff indicated he did not have a desire to re-start the psych medications that he had stopped taking of his own accord. Ultimately, the provider advised that he should follow-up with the nurse if problems persisted.

On March 23, 2019, Plaintiff was again seen by a nurse for the burning in his hands and feet. (Doc. 99-2 at 43).

On April 17, 2019, Zimmer noted in a follow-up from a medical furlough that Plaintiff was still concerned about burning in his hands and feet, but she noted his skin was cool to the touch, and he had "good cap refill" in all ten fingers. (Doc. 99-2 at 51).

On June 11, 2019, Plaintiff had a follow-up appointment with Zimmer about his hands and feet. (Doc. 99-2 at 58). Prior to the appointment, Zimmer researched Plaintiff's symptoms and independently concluded that he may be suffering from erythromelalgia. (Zimmer Aff., Doc. 99-15 at ¶¶ 81-83). She provided him with an article about the condition (Doc. 99-2 at 59-61) and prescribed a high dose of Aspirin consistent with the article. (Zimmer Aff., Doc. 99-15 at ¶¶ 84-85). Zimmer saw Plaintiff again on August 28, 2019, about his hands and feet, at which time she prescribed Tegretol (a mental health medication Plaintiff previously discontinued on his own in March of 2018). (Zimmer Aff., Doc. 99-15 at ¶ 86). Plaintiff did not seek further treatment for his hands and feet until March 2020 when he sought a Tegretol refill. (*Id.* at ¶ 87).

### C. Plaintiff's grievances

The record includes multiple grievances from Plaintiff about his medical issues. On April 8, 2018, Plaintiff grieved constant pain and blood in his urine.  (Doc. 92-3 at 15-16).  Lashbrook deemed the grievance an emergency on April 12, 2018.  (Doc. 92-3 at 15). The grievance office reviewed the grievance on April 16, 2018, and contacted the healthcare unit about the issues raised.  (Doc. 92-3 at 14).  Dr. Siddiqui and nurse supervisor Crain reviewed the medical records and indicated that by that time Plaintiff had been approved for an ultrasound.  The ultrasound was performed and was within normal limits.  Based on this information, the grievance was deemed moot.  (Doc. 92-3 at 14).  The ARB found the issue was appropriately addressed by the facility.  (Doc. 92-3 at 13).

On May 23, 2018, Plaintiff wrote a grievance concerning "problems with [his] kidney."  (Doc. 92-3 at 7).  He indicated his problems began in February, and he also saw Dr. Siddiqui in March, April, and May.  He indicated that although he had received an ultrasound that was normal in April, he was still in significant pain.  He expressed a desire to see a specialist.  (*Id.* at 7-8).  The grievance was deemed a non-emergency.  (Doc. 92-3 at 7).  The grievance officer made notes about the care received and consulted with the medical unit.  The medical unit indicated the issue had been addressed.  On October 25, 2018, Lashbrook concurred with the grievance, and on December 11, 2018, the ARB indicated the issue had been resolved by separate grievance (the separate grievance the ARB referenced was the April 8, 2018 grievance discussed above).  (Doc. 92-3 at 5).

On August 13, 2018, Plaintiff filed another grievance about excruciating pain, and blood in his urine.  (Doc. 92-3 at 11-12).  Lashbrook deemed the grievance an emergency on August 20, 2018.  (Doc. 92-3 at 11).  Dr. Siddiqui, and Crain responded to the grievance officer about this grievance and indicated that on August 15, 2018, Zimmer had provided an antibiotic, and Zimmer had referred Plaintiff to collegial review for further testing. The grievance office thus deemed the grievance moot based on the impression that the issue was being handled, and Lashbrook concurred with this finding on September 17, 2018.  (Doc. 92-3 at 10).  The ARB found that the facility appropriately addressed the issue. (Doc. 92-3 at 9).

On December 25, 2018, Plaintiff grieved burning in his hands and feet, and kidney problems.  (Doc. 92-3 at 3-4).  Lashbrook deemed the grievance an emergency on December 28, 2018.  Dr. Siddiqui and Crain reviewed the grievance, and advised the grievance officer of care from February of 2018 through December of 2018.  Dr. Siddiqui noted a urine test that was negative for infection on December 12, 2018.  Based on the information from the medical unit, the grievance officer deemed the issue moot, and Lashbrook concurred on January 7, 2019.  (Doc. 92-3 at 2).  On January 22, 2019, the ARB found that the facility appropriately addressed the issue, and instructed Plaintiff to follow up with the healthcare unit as needed.  (Doc. 92-3 at 1).

All grievances returned by the ARB were signed by John Baldwin.  (Doc. 92-3 at 1, 9, 13).

### D. Affidavits/depositions

Dr. Ritz averred that he is a Chief Medical Officer for Wexford, and he participates in collegial reviews. (Ritz Aff., Doc. 99-13 at ¶¶ 1-2). Ritz does not see patients, and his only involvement with Plaintiff was via collegial review. (*Id.* at ¶¶ 8, 11). He averred that he has no control over scheduling patient appointments. (*Id.* at ¶ 12). On March 15, 2018, he first participated in a collegial review with Dr. Siddiqui concerning Dr. Siddiqui's referral of Plaintiff for an ultrasound. (*Id.* at ¶ 13). On March 15, Dr. Ritz advised that he believed an alternative treatment plan was reasonable. He proposed that the facility obtain Plaintiff's prior test results from Chester Memorial Hospital and assess his responsiveness to the treatment previously recommended before proceeding to an ultrasound. (*Id.* at ¶¶14-15). On April 6, 2018, Plaintiff's case was raised again on collegial review and an ultrasound was approved. (*Id.* ¶¶ 16-17). On August 24, 2018, and again in January 2019, Dr. Ritz approved further offsite treatment. (*Id.* at ¶¶ 18, 20). Dr. Ritz had no involvement with the treatment of Plaintiff's hands and feet. (*Id.* at ¶ 21).

Dr. Siddiqui averred that at the relevant time he was the Site Medical Director at Menard. (Siddiqui Aff., Doc. 99-14 at ¶ 2). In that role, neither he nor other Wexford employees were responsible for scheduling appointments with internal or external care providers. (*Id.* at ¶ 5). On February 25, 2018, Dr. Siddiqui ordered that Plaintiff be taken to the Chester Memorial Hospital emergency room because he had an elevated temperature and dark urine. (*Id.* at ¶ 12). Plaintiff reported no history of UTIs at the hospital. (*Id.* at ¶ 13). Plaintiff was diagnosed with a UTI and pyelonephritis, and he was prescribed ten days of Cipro and given a dose of Cipro and Tylenol. (*Id.* at ¶ 14). On

March 2, 2018, Plaintiff's UTI was documented as improving, his prescription was changed to Bactrim, and he was scheduled for a follow-up with Dr. Siddiqui. (*Id.* at ¶¶ 18-21). On March 7, Dr. Siddiqui saw Plaintiff and a second urinalysis was performed. (*Id.* at ¶ 22).

Dr. Siddiqui recommended an ultrasound at the March 15, 2018, collegial review, but he agreed that in his medical judgment it was reasonable to start with an alternative treatment plan. (*Id.* at ¶¶ 26-27). On March 26, 2018, Plaintiff reported continued pain to a nurse practitioner, and he got three days of ibuprofen and an x-ray (with normal results). (*Id.* at 28). Siddiqui saw Plaintiff on April 2 and re-submitted him to collegial review for an ultrasound of his kidney and bladder, which was approved April 6, 2018. (*Id.* at ¶¶ 29-31). The ultrasound on April 13, 2018, showed no evidence of urine buildup, kidney stones, masses or lesions. (*Id.* at ¶ 32).

On May 8, 2018, Plaintiff again reported left flank pain, he saw a nurse and was given acetaminophen on May 13, 2018, and was referred to Dr. Siddiqui. (*Id.* at ¶¶ 33, 34). On May 16, 2018, Dr. Siddiqui prescribed Cipro and ordered a urinalysis and urine void culture. (*Id.* at ¶ 35).

On August 18, 2018, Zimmer consulted with Dr. Siddiqui and referred Plaintiff to collegial review for chronic recurrent UTIs and pain, and she prescribed Macrobid. On August 29, 2018, Dr. Siddiqui saw Plaintiff and noted a negative urine test. (*Id.* at 45). Plaintiff was to be scheduled for a urologist visit. (*Id.*).

On October 30, 2018, Plaintiff saw urologist Dr. Rajamahanty, who diagnosed him with prostatitis and recurrent UTIs. She recommended a CT urogram (imaging to

evaluate the urinary tract), a cystoscopy (a procedure to examine the bladder and urethra), and a trans rectal ultrasound guided biopsy (TRUS prostate biopsy).  (*Id.* at ¶¶ 48-49).  Dr. Siddiqui averred that the recommended tests were approved when the records were received, but he did not give a date for that event, he also averred that the appointments were approved in collegial review in mid-January 2019.  (*Id.* at ¶¶ 50, 60).

Meanwhile, on December 5, 2018, Dr. Siddiqui saw Plaintiff and charted that he had seen a urologist.  He did not report pain but reported odor in his urine.  (*Id.* at ¶ 54).  Dr. Siddiqui opted for repeat urinalysis tests, which occurred December 12, 2018, and January 2, 2019.

On January 10, 2019, Zimmer noted that Plaintiff was to be presented at collegial review for the tests recommended in October of 2018.  (*Id.* at 58).

The CT urogram was performed on February 22, 2019, but on February 27, 2019, Dr. Siddiqui charted that he did not yet have the results.  (*Id.* at ¶¶ 68-69).  The urogram showed no abnormalities to account for the ongoing symptoms.  (*Id.* at ¶ 69).  The TRUS biopsy and cystoscopy took place on April 2, 2019.  (*Id.* at ¶ 75).  The findings were normal, so Dr. Rajamahanty again diagnosed recurrent prostatitis, and prescribed Bactrim twice a day for a month, followed by once a day for three months.  (*Id.* at ¶¶75-76).

Dr. Siddiqui averred that in all the follow-up appointments, the diagnosis remained chronic prostatitis and UTIs, and the treatment was always over-the-counter painkillers and antibiotics.  (*Id.* at ¶ 85).  He believed that the chosen course of treatment was reasonable based on the objective findings, test and imaging results, Plaintiff's

subjective symptoms, and Plaintiff's response to various treatment. (*Id.* at ¶ 87). He believed the care provided was based on medical and professional judgment and was appropriate given the objective and subjective circumstances. (*Id.* at ¶ 89).

Nurse Practitioner Zimmer's affidavit is largely consistent with Dr. Siddiqui's. Of note, Zimmer averred that on November 1, 2018, she saw Plaintiff at a follow-up visit to his urologist visit, and she noted that he was to be scheduled for further testing. (Zimmer Aff., Doc. 99-15 at ¶ 51). On January 10, 2019, she saw Plaintiff for a second follow-up to his urology consultation, and she noted the tests needed to go to collegial review. (*Id.* at ¶ 58). During a January 25, 2019, visit, she informed Plaintiff that he had upcoming urology appointments, but he was argumentative, and threated to "see [her] in court." (*Id.* at ¶ 62-64). She ended the appointment when he raised his voice. (*Id.* at 64).

Prior to a June 11, 2019, appointment about his burning hands and feet, Zimmer conducted research on her own time and found a journal article that described symptoms like his. (*Id.* at ¶¶ 81-82). She shared the information on erythromelalgia, and subsequently provided treatment with Aspirin and Tegretol that she believed would address the problem. (*Id.* at ¶¶ 83-85). Plaintiff did not seek other treatment for this issue, other than to seek a refill of the Tegretol in March of 2020. (*Id.* at ¶ 87).

Defendant Crain supplied an affidavit concerning Plaintiff's medical conditions. Crain has been the healthcare unit administrator at Menard since February of 2019. (Crain Aff., Doc. 92-4 at ¶ 1). Crain does not treat patients, nor does she make treatment decisions. (*Id.* at ¶¶ 1, 3).

Plaintiff testified at his deposition that he would start to feel better, and then his symptoms would come right back.  (Aguilar Dep., Doc. 99-11 at 35:24-25).  He described his situation as constant pain that would not go away or would return a day after not being on medication.  (*Id.* at 36:5-9).  He further explained, "It never really was better. It was just the times that they would give me medications, it helped. And then once you take the medication away, it comes right back."  (*Id.* at 39:14-17).  He testified that after the tests in February of 2019 at some point the specialist told him that he had prostatitis. (*Id.* at 47:21-25).  At a follow-up appointment about the test results, he was given antibiotics for six months.  (*Id.* at 49: 11-12).  At the time of his deposition (December 17, 2021), he testified that he continued to have problems with left flank pain, and they still had not figured out the root cause.  (*Id.* at 53: 9-17).  Plaintiff testified that he had to be seen over and over and over before action was taken to send him to a specialist.  (*Id.* at 56: 3-20).  He believed that the delay was in part due to the structure he believed was in place.  It was Plaintiff's impression that he had to see a nurse, a nurse practitioner, and a doctor, over and over, and if that does not work after two or three times, then Dr. Ritz will approve an outside visit via collegial review.  (*Id.* at 57:1-13).  He stated that it took "months and months" to get approved for outside visits.  (*Id.* at 57:23-24).

Plaintiff testified that he did not have any specific information about policies maintained by Wexford other than what he stated in his complaint.  (*Id.* at 99-12, 71:18-22).  He stated he believed there had to be something, but he would "have to look into it and see if there is a policy in place."  (*Id.* at 71:24-72:5).

Plaintiff also testified that he believed that his UTIs caused prostatitis, because he read about it in a healthcare book. (*Id.* at 123-124). He admitted that he did not specifically know if this was a casual link for his own situation. (*Id.* at 124-125).

As to Defendant Baldwin, Plaintiff testified that he wrote Baldwin one or two letters, but he did not know if Baldwin received them. (*Id.* at 94:3). He stated he thought he had a copy of one letter. (*Id.* at 94:23). He did not know if Baldwin received his letters, or if he had a signatory review the grievances. (*Id.* at 95-96). His only familiarity with Baldwin was his knowledge that he sent him letters and that he filed grievances. (*Id.* at 115-116).

As to Defendant Lashbrook, he testified that he believed she was on notice of his issues based on his grievances. (*Id.* at 112:25-113:2). He believed that she was supposed to provide help in response to grievances. (*Id.* at 113:7-8). As to Walls, he alleges he wrote her grievances and letters, but never got a response, and he had no way of knowing if she investigated the matter. (*Id.* at 119: 7-11). As to Defendant Crain, the supervisor of nurses, Plaintiff testified that she was named in grievance responses, but he did not know if she did or did not investigate his issues. (*Id.* at 120:25-121:13).

**CONCLUSIONS OF LAW**

A. Legal Standards

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex*

*Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

Courts generally cannot resolve factual disputes on a motion for summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted).

To prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citation omitted). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett*, 658 F.3d at 750; *accord, Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See Greeno*, 414 F.3d at 653. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. Deliberate indifference involves intentional or reckless conduct, not mere negligence. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

B. Analysis

In response to summary judgment, Plaintiff submitted a narrative document, but he did not submit any documentary evidence, such as medical records, written policies, or an affidavit. He also did not respond directly to the Defendants' statements of material fact. In light of these deficiencies, the Court viewed the record broadly, construing all evidence in Plaintiff's favor as it must at this stage of the litigation. To the extent that Plaintiff identified specific issues in his response to summary judgment, the Court scrutinized those areas of the medical records.

1. IDOC Defendants

The IDOC Defendants argued that they are entitled to summary judgment because they were not personally involved in Plaintiff's medical care, and they are allowed to reasonably defer to the medical professionals at the facility. Plaintiff did not provide any narrative that was responsive to the IDOC Defendants' motion (Doc. 91) in his response to summary judgment. The Court will briefly discuss each defendant.

Defendants are correct that prison administrators are generally allowed to defer to treatment decisions made by prison medical staff. *See e.g.*, *Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019) (non-medical officials can rely on the actions and treatment provided by medical professionals at the facility, unless a grievance or correspondence makes it obvious that the treatment is somehow deficient). For example, a grievance officer, who is not a medical professional, may defer to medical professionals if he investigates a situation and determines that the medical staff is monitoring and addressing a problem. *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (finding that

after a grievance officer investigated complaints of pain and found treatment to be ongoing, that officer, the warden, and ARB officials were entitled to defer to the judgment of the treating providers).  The caveat to this general proposition is that a prison administrator cannot turn a deaf ear or a blind eye to an inmate's situation if it is obvious from the inmate's correspondence that there is an excessive risk to inmate health or safety. *Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015).  If an official refuses or declines to use his or her authority to investigate or address a problem that they are aware of, then it is possible to state a deliberate indifference claim against them for their own inaction. *Id.*  The plaintiff has the burden of proving that a communication to an official in its content and manner of transmission, gave the prison official sufficient notice to alert them to a risk to inmate health or safety.  *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (finding that an inmate did not carry this burden when her testimony about the purported communications was vague and was not corroborated by a copy of a letter or other supporting evidence).

Defendants contend that Baldwin was the acting Director of IDOC from August of 2015 through May 23, 2019, but he never communicated with Plaintiff during that timeframe regarding his medical needs.  At most, Defendants concede that Baldwin or a signatory of his signed two of Plaintiff's grievances on October 11, 2018, and on January 24, 2019.  The January 24, 2019, grievance signed by Baldwin (or a signatory) details extensive medical care at the facility, including a history of follow-up visits for each of Plaintiff's concerns.  (Doc. 92-3 at 1-2; 9-10).  Given the history of treatment described in this grievance, it was reasonable for Baldwin as an administrator to defer to the medical

expertise of the healthcare providers at the prison.  *See e.g., Giles* 914 F.3d at 1050 ; *Vance,* 97 F.3d at 994 (finding that the IDOC director was not deliberately indifferent with no evidence that he communicated with the inmate).  The same rationale applies to the October 2018 grievance.  (Doc. 92-3 at 9-10).  The grievance documentation shows that the facility addressed the medical issue grieved at multiple appointments.  In both scenarios, Baldwin signed off after direct care providers stated that Plaintiff had received necessary care.  As an administrator, nothing about this grievance documentation was sufficient to give Baldwin notice that he should intervene further.

At his deposition, Plaintiff testified that he sent one or two letters to Baldwin about his need for care, but he never received a response, and he cannot verify the contents or dates of those letters.  (Pltf. Dep., Doc. 99-12 at 23-27).  Plaintiff testified that he believed he had a copy of one letter.  (*Id.* at 24).  He testified that he could not be sure if Baldwin received and reviewed them.  The record does not contain a copy of Plaintiff's letter to Baldwin either with his Complaint or his response to summary judgment.  Without any concrete evidence to support his claims against Baldwin, and without any argument about Baldwin at summary judgment, summary judgment will be granted in favor of Baldwin because it is not clear that his limited involvement amounted to deliberate indifference.

The analysis is very similar for Warden Jacqueline Lashbrook.  Plaintiff testified, and the record reflects, that Lashbrook or a signatory reviewed a few of Plaintiff's grievances about his medical care.  The grievances demonstrate that on multiple occasions, Lashbrook deemed Plaintiff's situation an emergency and forwarded his

grievances for expedited handling.  Subsequent grievance documentation shows that on each of these occasions, the medical professionals were required to describe a responsive course of care.  Plaintiff testified at his deposition that he had never spoken to Lashbrook. (Aguilar Dep., Doc. 92-1 at 110:6-9).  He did not write Lashbrook letters, or otherwise correspond with her about his medical needs.  (*Id.* at 112:25-113:18).  Based on the record evidence, Lashbrook was not deliberately indifferent to Plaintiff's needs because she deemed his grievances emergencies on multiple occasions, and follow-up grievance documentation described an ongoing course of care.  There is no record evidence that Lashbrook knew the care provided was insufficient, but she declined to act.

As to Defendant Gail Walls, Plaintiff testified at his deposition that he wrote her letters and grievances about his medical needs, but he could not remember how many letters he wrote.  (Doc. 92-1 at 117-118:24).  He testified that he never got a response, so he did not know whether or not she received and reviewed his correspondence.  (*Id.*).  It was Plaintiff's burden to prove that his correspondence to Walls was sufficient to alert her to a serious risk to his health, but he has not met this burden so summary judgment on behalf of Walls is appropriate.

Plaintiff testified that he never saw Defendant Crain, but he believed she was involved in the provision of care because she was discussed in responses to grievances. He stated that he did not know if she had "anything to do with anything"—i.e. he had no clue if she failed to investigate his claims or if she ignored them.  (Aguilar Dep., Doc. 92-1 at 121:10-13).  Crain is listed in the grievance documentation as an individual who investigated the care being provided with Dr. Siddiqui.  As such, the documentation

suggests that Crain had some responsibility to respond to the issues presented, and to exercise whatever authority she may have had to seek appropriate care as needed. The claim against Crain is the most difficult to review because, as a first line investigator to issues presented in the grievances, Crain was more likely than the other officials named in this lawsuit to have an opportunity to assess the situation and to assess the appropriateness of the care provided. Nevertheless, it was Plaintiff's burden to show that Crain exhibited deliberate indifference in her investigation of his grievances, and Plaintiff did not set forth any evidence of his own about Crain. Although his medical issues presented in this lawsuit lasted for more than a year, he filed only 4 grievances during this time. Each time a grievance was reviewed, it was clear that some level of care was in place. There is no evidence that Plaintiff took additional steps to contact Crain to notify her that the care she described in grievance responses was insufficient. Based on the available record evidence, and Plaintiff's vague deposition testimony, summary judgment is warranted on behalf of Crain.

Based on the analysis about the individual acts of each IDOC Defendant, the record does not support a finding of the intentional infliction of emotional distress against these defendants, so summary judgment will be granted in favor of Defendants Baldwin, Lashbrook, Walls and Crain on Claim 3.

Finally, the Court notes that Plaintiff was previously allowed to proceed on a claim concerning overcrowding at Menard—Claim 4. Plaintiff did not discuss overcrowding in his response to summary judgment, and there is no obvious evidence in the record that

speaks to this claim.  Accordingly, summary judgment will be granted in favor of the IDOC defendants on this claim.

    This analysis resolves all claims against the IDOC Defendants.

    2.  Wexford Defendants

    An inmate can state a deliberate indifference claim based on an allegation that he received no care at all, or based on an allegation that the care he received was somehow deficient. *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019).  A claim of deficient care is "a challenge to a deliberate decision by a doctor to treat a medical need in a particular manner." *Id.*, citing *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 2008).  The standard, "reflects the reality that there is no single 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett*, 937 F.3d at 1023 (internal citation omitted).  "State-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment; the defendant's persistence in a course of treatment known to be ineffective, or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice or standards that a jury may reasonably infer that the decision was not based on professional judgment. " *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016).  A choice to pursue an easier or less effective course of treatment, or a non-trivial delay in treating serious pain may also support a claim of deliberate indifference. *Lockett*, 937 F.3d at 1023.

    An injury need not have been specifically diagnosed to have demanded action by a medical professional. *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015).  "An official may

not escape liability by 'refusing to verify underlying facts that she strongly suspects to be true.'"  *Id.*  To demonstrate that delay caused a cognizable injury, an inmate must show that the delay either exacerbated his injury *or* that it unnecessarily prolonged the pain. *Thomas v. Martija*, 991 F.3d 763, 771 (7th Cir. 2021).  In cases where prison officials delayed rather than denied treatment, the plaintiff must offer verifying medical evidence that the delay (rather than the underlying condition) caused some degree of harm.  *Id.* at 749, citing *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013).  An unexplained delay may warrant a finding of deliberate indifference if an inmate suffered unnecessary and prolonged pain and his condition deteriorated.  *McGowan v. Hulick*, 612 F.3d 636 (7th Cir. 2010) (dentist that inexplicably delayed referral to an oral surgeon for months on end may be deliberately indifferent).  "Whether a delay rises to the level of deliberate indifference depends on how serious the condition is and the ease of treatment."  *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022).  A plaintiff may withstand summary judgment if he puts forth sufficient evidence for a reasonable jury to conclude that a provider's inaction substantially and unreasonably delayed necessary treatment.  *See White v. Woods*, 48 F.4th 853, 862 (7th Cir. 2022).

The Wexford Defendants presented a coherent narrative about the course of care that they provided for Plaintiff's two medical conditions—his chronic infection, and the itching, burning and redness of his palms and feet.  The Court will treat both conditions as objectively serious for purposes of this analysis.  Plaintiff's primary contention is not that he received no medical treatment, but rather that he received delayed medical treatment.  To establish that a delay in treatment rose to the level of deliberate

indifference, a Plaintiff must offer verifying medical evidence.  Although Plaintiff did not offer independent verifying medical evidence, he has proceeded pro se up to this point in the litigation, which would make it particularly difficult for him to secure independent medical evidence or to retain an expert for deposition testimony.  Given Plaintiff's status as a pro se litigant who is incarcerated, the Court scrutinized the medical records in the light most favorable to Plaintiff to determine if there was a delay in care that caused harm.  Upon close examination, the Court concludes that there is a genuine dispute of fact about the delays in care, as to Defendants Siddiqui and Zimmer, but not as to Dr. Ritz.  Each provider will be discussed in turn.

a.   Dr. Ritz

Plaintiff argues that Dr. Ritz was deliberately indifferent to his needs because he delayed a urologist visit.  The parties agree that Dr. Ritz participated in Plaintiff's care solely in the capacity of collegial review with Dr. Siddiqui.  Dr. Ritz never examined Plaintiff, and there is no evidence that Plaintiff directly communicated with Dr. Ritz about his care.  Dr. Ritz only denied a recommendation for Plaintiff's care on one occasion during collegial review—on March 16, 2018, Dr. Ritz declined Dr. Siddiqui's recommendation of a renal ultrasound as a follow-up to Plaintiff's original diagnosis with a UTI.  (Doc. 99-2 at 69).  Dr. Ritz recommended an alternative treatment plan, which required the facility to first obtain a copy of the CT report from Plaintiff's February 25, 2018, hospital admission, and to conduct an assessment after Plaintiff finished his course of antibiotics.  Plaintiff's case was to be returned to collegial review to discuss the details.

On April 6, 2018, Plaintiff's case was re-reviewed by Drs. Ritz and Siddiqui. Dr. Siddiqui reported a relapse of symptoms, and Dr. Ritz approved an onsite ultrasound of the kidneys and bladder. (Doc. 99-3 at 3). The ultrasound was performed on April 13, 2018, but it revealed no evidence of any masses, lesions, or other abnormalities. (Doc. 99-3 at 2).

To the extent that Plaintiff complains about the impact of a delay from the February 25 diagnosis of his infection until the April 6 approval by Dr. Ritz for an ultrasound, it is not clear that the delay or course of care in the intervening time amounted to deliberate indifference. On February 26, 2018, Plaintiff reported to the nurse that he did not have "much pain," and he had received an antibiotic. He reported his discomfort to be only a 1-2 of 10 on the pain scale. (Doc. 99-1 at 54). He was prescribed Cipro for 10 days, and he was authorized to return to the housing unit.

On March 2, 2018, Plaintiff reported to a nurse that he had pain of a 10 out of 10 at 9 am, so he was referred for further care. Later that same day, he reported to Nurse Practitioner Moldenhauer that he was very sore but felt a lot better. She specifically quoted him as saying, "trust me I feel better." (Doc. 99-1 at 58). Despite this interaction, a urinalysis was performed and reviewed by Dr. Siddiqui. They decided to switch Plaintiff from Cipro to Bactrim, and he was given a ten-day course, and an order to return for a follow-up. On March 7, Dr. Siddiqui saw Plaintiff for a follow-up.

Dr. Siddiqui recommended Plaintiff for an ultrasound in collegial review on March 15, 2018, but Dr. Ritz suggested that they hold off on the ultrasound, complete the

antibiotics, and repeat a urinalysis.  (Doc. 99-2 at 69).  Dr. Siddiqui believed this was a reasonable alternative treatment plan.  (Siddiqui Aff., Doc. 99-14 at 4).

On March 26, Plaintiff returned to the medical unit with complaints of pain that was a 7 out of 10.  There were abnormal findings for a urine dipstick.  He was given three days of ibuprofen and told to return in 48 hours if problems persisted.  (Doc. 9-1 at 62). Plaintiff returned on March 28, but was told to follow-up in one week as scheduled.  (Doc. 99-1 at 63).  On April 2, Dr. Siddiqui saw Plaintiff and repeated the referral for an ultrasound and a urinalysis.  (*Id.*; Doc. 99-3 at 1).  The urinalysis was done on April 4. (Doc. 99-1 at 65).  The ultrasound of Plaintiff's kidneys and bladder was approved through collegial review with Dr. Ritz on April 6, 2018.  (Doc. 99-3 at 3).  The ultrasound was performed on April 13, 2018, but it showed no evidence of urine buildup, kidney stones, masses or lesions.  (Doc. 99-3 at 2; Siddiqui Aff., Doc. 99-14 at ¶ 32).

On May 8, 2018, Plaintiff presented to the healthcare unit again with pain in his left side.  (Doc. 99-1 at 66).  He was seen on May 13 by a nurse with pain reported at a level of 10 out of 10.  He was referred to Dr. Siddiqui, and saw him on May 16, 2018, at which time Dr. Siddiqui prescribed Cipro.

Although these interactions are not the end of Plaintiff's ailments, they are the interactions that immediately surround the alleged issue of Dr. Ritz's denial of an ultrasound in March of 2018, and his recommendation to follow an alternative course of care.  When asked about this timeframe at his deposition, Plaintiff testified that during the relevant time, his symptoms would improve, but then they would return.  This cycle of improvement and relapse caused him to return to the medical unit often. Reviewing

this evidence as a whole, Dr. Ritz's recommendation to first finish the course of antibiotics and to repeat a urinalysis rather than proceed right to an ultrasound on March 15, 2018, did not amount to deliberate indifference.  Dr. Ritz never personally examined Plaintiff, so he was completely reliant on information presented by Dr. Siddiqui to determine an appropriate course of care.  Both Drs. Ritz and Siddiqui averred that they believed it was a reasonable and appropriate alternate course of care on March 15, 2018, to complete the course of antibiotics and to repeat a urinalysis before proceeding to other diagnostic tests. (Ritz Aff., Doc. 99-31 at ¶¶ 14-15; Siddiqui Aff., Doc. 99-14 at ¶¶26-27).

On March 2, 2018, medical notes indicate that Plaintiff stated he was feeling a lot better, and his pain had been reduced with medication.  Plaintiff was seen by Dr. Siddiqui on March 7, 2018, but there is no indication in the medical records that he was in ongoing pain at that time.  Plaintiff did not return to the medical until March 26, 2018, with complaints of recurrent pain.  This timeline, coupled with Plaintiff's own testimony that his pain would go away and return, shows that it was not unreasonable for Drs. Ritz and Siddiqui to await the outcome of Plaintiff's first course of antibiotics before proceeding to an ultrasound.  When Dr. Siddiqui represented the case to Dr. Ritz on April 6, 2018, the ultrasound was approved without further question because the symptoms had relapsed.  Based on the available evidence, Drs. Ritz and Siddiqui's initial course of care was medically reasonable, and their actions in the initial collegial review process in March and April of 2018 did not amount to deliberate indifference.

On the other occasions when Plaintiff's case was presented to Dr. Ritz via collegial review, Dr. Ritz always approved the recommended care.  Dr. Ritz averred that he did

not have control over when medical appointments were scheduled once he approved them.  The record also suggests that prior to Plaintiff's February 2018 UTI, he did not have a history of UTIs, or other bladder or kidney infections.  Thus, with the information available to Dr. Ritz, and based on his limited role with the collegial review process, the Court does not find that there is a genuine dispute about Dr. Ritz's involvement. Summary judgment will be granted in favor of Dr. Ritz.

b.  Dr. Siddiqui

Turning to Dr. Siddiqui, as discussed above in relation to Dr. Ritz, the Court does not find that the initial care from Dr. Siddiqui from February 25, 2018, up through the initial collegial review on March 16, 2018, was deficient.  The Court notes that on March 26 and 28, 2018, Plaintiff attempted to seek care from the healthcare unit for renewed pain, but it is not clear that Dr. Siddiqui knew about this until he saw Plaintiff April 2, 2018, at which time he again prescribed antibiotics and renewed the referral for an ultrasound.  (Doc. 99-1 at 62-63).

In May and June of 2018, Plaintiff attended nurse sick call multiple times, and he eventually saw Nurse Practitioner Zimmer about ongoing pain.  (Doc. 99-1 at 66-70; Doc. 99-2 at 1).  These visits continued in June and July, but there is no evidence that Dr. Siddiqui knew about the visits at the time.  (Doc. 99-2 at 2-7).  On August 15, 2018, Zimmer consulted Dr. Siddiqui about ongoing issues and suggested a referral to collegial review for recurrent UTIs and left flank pain.  (Doc. 99-2 at 7).  Dr. Siddiqui agreed with this recommendation.

Plaintiff contends in response to summary judgment that there was an impermissible delay from August 2018 when he was approved to see an outside specialist, until October of 2018 when he was actually taken to see a specialist. The medical records support this allegation of a delay. On August 24, 2018, Dr. Ritz approved a referral to an outside urologist to assess Plaintiff's recurrent UTIs, and left side pain. (Doc. 99-3 at 4). On August 29, 2018, Plaintiff was seen by Dr. Siddiqui for a follow-up on an August 22, 2018 urinalysis, which was noted as negative. (Siddiqui Aff., Doc. 99-14 at ¶ 45). Dr. Siddiqui noted that on August 29, Plaintiff was on Macrobid and his symptoms had improved. There was an active referral for him to see a urologist. (*Id.*).

A memorandum from the Health Care Unit dated September 18, 2018, indicates that a medical furlough was scheduled for October 30, 2018. (Doc. 99-3 at 5). Both Drs. Ritz and Siddiqui averred that they did not have control over how long it took IDOC to schedule medical furlough visits to specialists. (Siddiqui Aff., Doc. 99-14 at ¶ 61; Ritz Aff., Doc. 99-13 at ¶ 12). Because there is no evidence that Dr. Siddiqui could control this delay, the delay itself does not support a finding of deliberate indifference.

Plaintiff was taken to the specialist on October 30, 2018. The medical records provided by the Defendants do not contain any narrative summary of Dr. Rajamahanty's assessment. The documents from October 30 include nurse intake notes from SIH medical. At the top of the intake notes, which appear to have been faxed, the document indicates it was faxed on November 16, 2018, and that it was pages 3 and 4 of 4. (Doc. 99-3 at 7-8). The record does not contain the first two pages. There is also an IDOC inmate transfer summary form with handwritten notes that indicate a recurrent UTI, a

prescription, and test recommendations for a CTU, cystoscopy and TRUS prostate.  (Doc. 99-3 at 6).  On November 1, 2018, Zimmer saw Plaintiff for a follow-up on the urologist visit and she noted the recommendation for further tests.  Both Dr. Siddiqui and Zimmer averred that all recommended tests were approved when they received the records from the appointment, and they also stated the tests were approved at collegial review in mid-January 2019.  They do not acknowledge the delay from October 30 to January, and they do not provide a date when they received the records from the October 30 visit.  Per the only documents available—the records may have been received on November 16, 2018.

The lag from October 30, 2018, until the recommended tests were presented to collegial review in January of 2019 is the most concerning aspect of this case.  Dr. Siddiqui and Zimmer both averred that on October 30, 2018, the specialist diagnosed prostatitis and recommended further tests.  According to the Cleveland Clinic, both acute and chronic prostatitis can be linked to UTIs, and prompt treatment of UTIs can help to prevent acute prostatitis.  Chronic prostatitis is difficult to manage and can require a lengthy or constant course of antibiotics.  The tests the specialist recommended are all listed by the Cleveland Clinic as methods to pinpoint the nature of prostatitis.  It is not at all clear from the records or the affidavits why the October 30, 2018, recommendations from the urologist took until January of 2019 to make it to the collegial review process.

Dr. Siddiqui averred that he is not responsible for scheduling medical visits, but both he and Zimmer saw Plaintiff in the weeks following the October 30 visit and there is no indication that they even relayed the information that more visits needed to be scheduled.  Specifically, Zimmer saw Plaintiff on November 1, and Dr. Siddiqui saw

Plaintiff on November 28 and December 5.  There is no explanation for the delay in the record, other than Dr. Siddiqui's note on a January 10 medical services referral report that Dr. Rajamahanty "ordered further tests, but was never scheduled.  Inmate continues to have problems."  (Doc. 99-3 at 10).

The Court finds that the existence of this delay in the record, coupled with Plaintiff's testimony and grievance documents indicating that he had nearly constant pain, are sufficient to create a genuine dispute of material fact about the delays in treatment after the October 30 visit.  Although the delays in May, June, and July were not sufficient to constitute deliberate indifference by Dr. Siddiqui, the existence of these delays in  the total course of care is significant.  From the onset of symptoms in February of 2018, Plaintiff was seen and treated repeatedly, but then he waited an additional three to four months for the specialist's recommendations to be implemented.  It is possible that a reasonable jury, could view the evidence and conclude that Plaintiff was forced to suffer in unnecessary pain, or that the delay caused a worse outcome for his prostatitis. It is noteworthy that the Defendants did not submit deposition testimony on behalf of Dr. Siddiqui in this case.  Without deposition testimony, the affidavits provided hardly more than a digest of the medical records.  With more comprehensive evidence it is possible that a reasonable jury could find that the care was adequate, or that the delays were too great.  *See White*, 48 F.4th at 862-83 (finding that persisting in a course of care that was not helping, coupled with delays, and a worsened outcome, was sufficient to allow reasonable jurors to reach a finding in favor of a plaintiff or medical providers).

The timeframe for potential liability is limited. Once the appointments were approved by Drs. Ritz and Siddiqui on January 25, 2019, the issue was again out of their hands as they did not have control over external scheduling. The Court finds that there is only a question of deliberate indifference for the delay by Dr. Siddiqui from October of 2018 until January 25, 2019 when the tests recommended by the specialist were approved.

As to care for Plaintiff's hands and feet, the Court finds that Dr. Siddiqui did not exhibit deliberate indifference to this condition. Dr. Siddiqui saw Plaintiff for this complaint in November of 2018, and he suggested that Plaintiff seek care from the psychiatrist for this issue because he noted that Plaintiff had discontinued some of his medications. This recommendation does not appear unreasonable, because eventually it appears that the problem was resolved or at least mitigated when Zimmer re-prescribed Tegretol (one of the psychiatric medications Plaintiff had discontinued). Accordingly, the record does not support genuine dispute of fact about Dr. Siddiqui's response to this condition.

c.  Nurse Practitioner Zimmer

Zimmer's care overlapped with Dr. Siddiqui's as discussed above, but the analysis is a bit different because Zimmer is a nurse practitioner, rather than a physician. The law recognizes that in the medical setting, different professionals may have different obligations and authority based upon their role in the care chain. "As a general matter, a nurse can, and in-deed must, defer to a treating physician's instructions. However, that deference cannot be 'blind or unthinking.' Under some circumstances when a nurse is aware of an inmate's pain and the ineffectiveness of the medications, a delay in advising

the attending physician or in initiating treatment may support a claim of deliberate indifference." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 485-86 (7th Cir. 2022).  A nurse practitioner typically has greater professional autonomy than a registered nurse, but in this case it appears that Zimmer worked in conjunction with Siddiqui and at times sought his approval, so her actions were viewed consistent with a nurse who would be required to defer to or report to a treating physician.

Per Zimmer's affidavit, she first saw Plaintiff for his left flank pain on June 6, 2018. (Zimmer Aff., Doc. 99-15 at ¶ 37).  At this time, Plaintiff had been to the medical unit on many occasions since his April ultrasound.  Zimmer scheduled Plaintiff for a number of labs to determine his kidney function and to check other metrics.  On June 22, 2018, Zimmer had a follow-up visit with Plaintiff and she assessed his condition as "normal." (Zimmer Aff., at ¶ 38).  On June 28, plaintiff saw a nurse for ongoing pain.  The nurse's notes indicated that he had pain of 8 out of 10, and he had presented to nurse sick call more than twice in a month about the same pain.  (Doc. 99-2 at 4).  Plaintiff apparently had acute signs of severe discomfort.  The notes indicate he was referred to see an "MD."

On July 23, 2018, Zimmer saw Plaintiff again and prescribed Macrobid and ordered x-rays of his chest and ribs.  On August 18, Zimmer saw Plaintiff again and based on urinalysis test results she determined that he had a urology problem.  At that time, her "treatment plan was then to refer Plaintiff to Collegial Review for chronic, recurrent UTIs and flank pain, and to prescribe Macrobid, an antibiotic used to treat bladder infections."  (*Id.* at ¶41).  Zimmer consulted with Dr. Siddiqui, and Dr. Siddiqui agreed with the plan.  (*Id.* at ¶ 42).

Zimmer's care began on June 6, 2018, and there is no indication that she knew about Plaintiff's medical issues prior to that date, so that is the start point of her potential liability. At the first June appointment, she ordered many labs in an effort to address plaintiff's recurring pain and urinary problems. The labs were done on June 13, 2018, and a follow-up visit on June 22, 2018, noted that everything was 'normal.' Despite these notations, Plaintiff went to sick call just six days later on June 28 and it was noted that it was the third time in a month he sought care for the same symptoms. Sick call suggested his vital signs were not normal and he was in acute distress, but Zimmer did not see him again until July 23, at which time she prescribed Macrobid. This course of events suggests that in June and July of 2018, a reasonable jury could conclude that Plaintiff was left to suffer needlessly in pain, and that he suffered from infections for which he did not receive immediate treatment.

There is no explanation for the lag from June 28 to the July 23 appointment with Zimmer. Zimmer prescribed Macrobid for a week on July 23, and then prescribed it again for a week on August 15 and noted a 'urology problem.' These notes could permit an inference that the treatment being provided was not effective. Despite knowing on June 6, 2018, that Plaintiff had a recurrent condition, Zimmer waited until August to consult with Dr. Siddiqui and to put in a collegial review.

A reasonable jury could find that Zimmer's actions were sufficient, but they could also conclude that Zimmer allowed Plaintiff to suffer in pain for longer than necessary, that she doggedly persisted with treatment that was not working, or that the delays caused his condition to worsen. As with the analysis of the claims against Dr. Siddiqui,

the Court had little information to consider on these issues because there was no deposition testimony from Zimmer, nor was there an independent medical expert's review of the files.  The Court finds that there could be a genuine dispute of fact about Zimmer's care starting in June of 2018 up until the August 15, 2018 referral to collegial review.  Additionally, the Court finds that there could be a genuine dispute of fact about Zimmer's care from October 30, 2018, through January 25, 2019, for the same reasons explained above concerning Dr. Siddiqui.

One more aspect of Zimmer's care warrants mention.  Plaintiff alleged in response to summary judgment that Defendant Zimmer failed to provide him adequate treatment because she ended a visit abruptly.  The medical records reflect that on January 24, 2019, Zimmer ended an appointment because Plaintiff was argumentative, and he started to raise his voice.  (Doc. 99-2 at 29).  He threated "see you in court."  (*Id.*).  During the appointment, Plaintiff complained of redness and burning in his hands and feet, and he expressed concerns about ongoing kidney problems.  He was advised that he had an upcoming urology appointment.  Records reflect that during collegial reviews on January 17, 2019 and January 24, 2019, Dr. Ritz approved further outside testing with the urologist.  (Doc. 99-2 at 27, 30).  Visits with the outside specialist for a variety of tests occurred in February of 2019.  Relevant to these visits, on February 14, 2019, Zimmer assessed Plaintiff and reported no remarkable issues.  (Zimmer Aff., Doc. 99-15 at ¶ 66).  Zimmer's decision to end a single visit early did not amount to deliberate indifference.

Turning to Plaintiff's contentions about his hands and feet.  Zimmer did not see Plaintiff again until June 11, 2019, for complaints about his hands and feet.  Prior to that

appointment, Zimmer conducted independent research about Plaintiff's symptoms and concluded that his symptoms may likely be erythromelalgia. She provided Plaintiff with a printout from the Cleveland Clinic Journal of Medicine about the condition, and consistent with the printout she prescribed a high dose of aspirin. Zimmer followed up on August 28, 2019, at which time she prescribed Tegretol (a medication Plaintiff's psychiatrists had previously prescribed, but that he had stopped taking). Plaintiff did not seek any treatment for his hands and feet again until March of 2020, when he sought a Tegretol refill. Accordingly, Zimmer is entitled to summary judgment solely about the care provided for Plaintiff's hands and feet because Plaintiff has not created a genuine dispute of fact about the care that Zimmer provided for this issue.

d.  Wexford

In addition to the claims against individual providers, Plaintiff contended in Count 2 of his complaint that Wexford exhibited deliberate indifference to his serious medical needs via a number of constitutionally inadequate polices or practices. In response to summary judgment, Plaintiff insists that Wexford's collegial review process caused delays in his care and their requirement that an inmate first seek care via the nurse sick call delayed his care. He also made much of the fact that in other class action litigation, deficiencies were found in the IDOC medical care system, which he insisted still have not been addressed.

Wexford, a private corporation, cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014);

*see also Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Thus, under *Monell*, for Plaintiff to recover from Wexford, he must show that the alleged constitutional violation was caused by: (1) an express policy that caused a constitutional deprivation when enforced; (2) a widespread practice that was so permanent and well-settled that it constituted a custom or practice; or (3) a person with final policymaking authority. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). In other words, a plaintiff must show that "systematic and gross deficiencies in …[IDOC's] medical care system," caused his injury, and also that "a policymaker or official knew about these deficiencies and failed to correct them." *Daniel v. Cook Cty.*, 833 F.3d 728, 735 (7th Cir. 2016). Alternatively, a plaintiff must show that "the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Dixon v. Cty. Of Cook*, 819 F.3d 343, 348 (7th Cir. 2016).

Evidence of a widespread practice of failing to review inmates' timely medical requests could support a finding of deliberate indifference against an entity, but isolated acts of individual employees are not actionable. *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 488 (2022). If a plaintiff relies on a widespread practice, such as failure to respond to healthcare requests, he  must also show that the entity he seeks to hold liable had an actual role in the failure to respond. *Id.* at 489. Another possible source of liability on behalf of an entity could be chronic understaffing, or delays in treatment. *Id.* But, to find liability based on any of these theories, an inmate would need to show actual harm from the alleged issue. *Id.* at 489-90.

In assessing *Monell* liability, it is important to distinguish between isolated wrongdoing, or the acts a few rogue employees, and other more widespread practices. *Howell*, 987 F.3d at 654. There is not a bright line rule as to the necessary quantity, quality, or frequency of conduct to show a widespread custom or practice, but there must be evidence that there is a true corporate policy, rather than a random event. *Id.* To establish a widespread practice, an inmate must identify multiple injuries either to himself or others. *See e.g. Stockton v. Milwaukee County*, 44 F.4th 605, 617 (7th Cir. 2022).

Plaintiff first argues that a Wexford policy required him to put in a nurse sick call slip to get care, and that he should not have been required to use this process after his initial diagnosis. He does not provide any affirmative evidence to show that this was a formally adopted policy. He also does not provide any evidence that a problem with the nurse sick call procedure arose on many occasions, that it impacted individuals other than him, or that it caused him harm. For example, Plaintiff does not quantify how many times he was required to use nurse sick call to get care, nor does he quantify how many times he believes it delayed treatment. He also does not provide any evidence to quantify how often this procedure impacted other inmates. Assuming arguendo that Plaintiff and others were frequently subjected to the nurse sick call practice, Plaintiff still cannot show any measurable harm based on this practice.

Many of the medical notes are thorough, with indications of his temperature, level of pain, medical history, etc.. On occasions when Plaintiff reported significant pain, it appears that he was given over-the-counter pain medication until he could be seen by another provider. At his deposition, Plaintiff testified that he was never required to

purchase pain medication from the commissary to address his pain, though he believed he should have been provided with a  stronger painkiller.  (Aguilar Dep., Doc. 99-11 at 26-29).  The existence of a policy or practice that required an offender to start with a nurse and work his way up the chain is not itself proof that the care available was inadequate.  Plaintiff does not argue that he was refused appointments via nurse sick call, or that they offered him no assistance.  Instead, he chooses to argue that they did not provide the exact sort of care that he desired, which is not a constitutional violation.

As to Plaintiff's argument that the collegial review process is unconstitutional, and that it has been scrutinized in other litigation, Plaintiff does not have evidence that he was personally harmed by the process.  As the Defendants point out in their summary judgment motion, the collegial review process is not unconstitutional on its face.  *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 651 (7th Cir. 2021).  The Court already analyzed the impact of collegial review on Plaintiff's care when discussing the claims against Drs. Ritz and Siddiqui and concluded that the process did not cause delays that rose to the level of constitutionally deficient care.  The same analysis applies to Plaintiff's claim against Wexford concerning collegial review.  Although it may be possible to prove the existence of a scenario where Wexford's collegial review process caused actual harm to an individual, Plaintiff's own experience with the collegial review process did not amount to deliberate indifference.

To the extent that Plaintiff argues there were other Wexford policies, practices, or customs that caused him harm, he has not proffered sufficient evidence to withstand summary judgment.  Plaintiff did not provide any evidence in support of his response to

summary judgment.  While the Court recognizes that it can be difficult for plaintiffs to gather policy or practice evidence that may depend on reference to the medical care that other inmates have received, the record does not reflect any documented efforts by Plaintiff to gather evidence beyond his own experiences.  In *Howell,* Plaintiff introduced affidavits from fellow inmates about their similar medical experiences, and he intended to call fellow inmates at trial as witnesses.  Here, Plaintiff has not provided affidavits, medical records, written policy statements, or any other form of evidence that could transform his policy claims from mere allegations at the complaint stage, into genuine disputes at summary judgment or at trial.  Without any firm evidence, Plaintiff's claims against Wexford relative to the care he received from February of 2018 to May of 2019 do not rise to the level of constitutional harm.

e.  Intentional infliction of emotional distress

Plaintiff's claim against Drs. Ritz and Siddiqui, and Zimmer concerning intentional infliction of emotional distress cannot proceed based upon the record evidence.  To prevail on an intentional infliction of emotional distress claim under Illinois law, Plaintiff must prove that (1) the defendants engaged in extreme and outrageous conduct; (2) the defendants either intended to inflict severe emotional distress or knew there was a high probability that the conduct would cause severe emotional distress; and (3) the defendants' conduct in fact cause severe emotional distress.  *McGreal v. Village Orland Park*, 850 F.3d 308 (7th Cir. 2017).  The conduct by these three defendants was not extreme and outrageous, nor is there any evidence that they acted with an intent to harm Plaintiff.  To the contrary, during the relevant time, the record shows that Plaintiff

discontinued many of his mental health medications.  Based on the available evidence, summary judgment will be granted on Claim 3 against Drs. Ritz, Siddiqui, and nurse practitioner Zimmer.

    3.   Conclusion

Summary judgment will be granted in favor of all IDOC defendants on all claims against them (Claims 1, 3, 4).  Summary judgment will also be granted in full favor of Dr. Ritz, and Wexford.  Summary judgment will be granted as to all IDOC Defendants, and all Wexford Defendants on Claim 3 concerning the intentional infliction of emotional distress.  By contrast, summary judgment will be denied in part as to Dr. Siddiqui for the delay in care from October 30, 2018 to January 25, 2019, and to Zimmer for the potential delays in care from June 2018 to August 15, 2018 and October 30, 2018 to January 25, 2019.  The denial applies solely to the care for Plaintiff's kidney or urinary problems and prostatitis.  Summary judgment is granted in part as to Dr. Siddiqui and Zimmer for their treatment of Plaintiff's red/burning hands and feet.  This leaves Claim 1 against Dr. Siddiqui and Zimmer, solely for the identified periods of potential delay.

**DISPOSITION**

The IDOC Defendants' Motion for Summary Judgment (Doc. 91) is **GRANTED in full,** and this action is **DISMISSED with prejudice** as to Defendants John Baldwin, Jacqueline Lashbrook, Gale Walls, and Angela Crain.  The Wexford Defendants' Motion for Summary Judgment (Doc. 98) will be **GRANTED in full** as to Defendants Dr. Ritz and Wexford and these parties should be **DISMISSED with prejudice**.  Summary Judgment (Doc. 98) is **GRANTED in part** as to Dr. Siddiqui and Zimmer.  The sole

remaining claim will be Count 1 against Defendants Siddiqui and Zimmer for delays in care related to Plaintiff's kidney/urinary/prostatitis issues.   This case will be set for a settlement conference or mediation by separate order.

**IT IS SO ORDERED.**

Dated: January 30, 2023

DAVID W. DUGAN
United States District Judge